UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

ILYA KOGAN,

Defendant.

---

16 Cr. 221-1 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

Defendant Ilya Kogan, who is currently incarcerated at the satellite prison camp adjacent to the Federal Correctional Institution in Cumberland, Maryland (hereinafter, "FCI Cumberland"), has applied for compassionate release, in the form of immediate release to his family home in Watchung, New Jersey, pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. #251, 253).[1] In brief, Mr. Kogan contends that he is at an increased risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus based on the combination of his pre-existing medical conditions, the conditions of his confinement, and the fact that inmates and staff within the FCI Cumberland complex have tested positive for COVID-19. The Government opposes this motion. (Dkt. #256). As set forth in the remainder of this Order, the Court denies Mr. Kogan's motion for compassionate release.

## BACKGROUND

Mr. Kogan was charged in two separate cases, which were docketed as Case Nos. 16 Cr. 221 and 17 Cr. 541 and were initially assigned to the

---

[1] Unless otherwise specified, references to docket entries pertain to the docket of Case No. 16 Cr. 221 (KPF).

Honorable Robert W. Sweet.  The 2016 case, in particular, has an extensive procedural history that is detailed in multiple prior opinions from Judge Sweet and one from this Court, all of which are incorporated herein by reference.  *See United States* v. *Hasan-Hafez*, No. 16 Cr. 221-2 (KPF), 2020 WL 2836782, at *1 (S.D.N.Y. June 1, 2020) (order resolving compassionate release motion brought by co-defendant); *United States* v. *Kogan*, No. 16 Cr. 221 (RWS), 2019 WL 494013, at *1 (S.D.N.Y. Feb. 8, 2019) ("*Sentencing Opinion*"); *United States* v. *Kogan*, No. 16 Cr. 221 (RWS), 2017 WL 4402577, at *1 (S.D.N.Y. Oct. 3, 2017) (denying motion for reconsideration of prior decision that denied motion to compel production); *United States* v. *Kogan*, 283 F. Supp. 3d 127, 128 (S.D.N.Y. 2017) (denying motions to dismiss and to compel production).

The operative superseding indictment in the 2016 case, S2 16 Cr. 221 (RWS), was returned on February 14, 2018, and charged Mr. Kogan and a co-defendant, Ashraf Hasan-Hafez, in two counts:  Count One charged that from at least January 2010 through August 2013, Mr. Kogan and others conspired to commit health care fraud, in violation of 18 U.S.C. § 1349, by executing a scheme to defraud Medicare and Medicaid in connection with the delivery of and payment for health care benefits, items, and services.  Count Two charged that from at least January 2010 through August 2013, Mr. Kogan and Mr. Hasan-Hafez committed the substantive offense of health care fraud, in violation of 18 U.S.C. § 1347.  (Dkt. #162 (the "2016 Indictment")).  The fraud was committed in part through a physical therapy practice, Excellent Care Physical Therapy, for which Mr. Hasan-Hafez was the listed owner; Mr. Kogan

operated an acupuncture company, Zen Acupuncture, from the same office space. (Final Presentence Investigation Report ("PSR") ¶¶ 22-43).

The Government accurately summarized the extensive discussion of the offense conduct that is set forth in Mr. Kogan's PSR, and the Court includes that summary here for convenience:

> Kogan and Hasan-Hafez committed fraud by pressuring employees to add services to the "progress notes" that described patients' treatments and to add billing codes to the bills sent to Medicare and Medicaid so that those entities were billed for physical therapy services that were never in fact provided. In some cases, patients received only acupuncture — which is not reimbursable by Medicare or Medicaid — yet Medicare and Medicaid were billed as though these patients had received physical therapy, which is reimbursable. In other cases, patients did receive some physical therapy, but Medicare and Medicaid were billed as though the patients had received other types of physical therapy that provided higher rates of reimbursement, or as though they had received longer periods of physical therapy than they actually did. And in some cases, although Medicare and Medicaid were billed for patients having received physical therapy, the employees who provided those services were not properly supervised or not licensed to do so — which constituted a fraud because neither Medicare nor Medicaid reimburses claims for services provided by practitioners who are not licensed or properly supervised. When the employees resisted Kogan's directions to create such fraudulent billing, Hasan-Hafez directed the employees to follow Kogan's instructions. *See, e.g.*, PSR ¶¶ 24-34 (describing cooperating witness testimony); PSR ¶¶ 35-43 (describing patient testimony and fraudulent billing records).
>
> In total, Medicare and Medicaid suffered actual losses of $1,297,000 as a result of the Health Care Fraud Scheme. The total actual and intended losses of the scheme totaled between $1,500,000 and $3,500,000. *See* PSR ¶ 45.

(Dkt. #256 at 2).

Trial on the 2016 Indictment was initially scheduled for December 4, 2017 (Minute Entry for July 18, 2017), but was subsequently adjourned until March 19, 2018 (Dkt. #166).  On March 16, 2018, the Friday before the Monday of trial, Mr. Kogan and Mr. Hasan-Hafez each pleaded guilty to both counts of the 2016 Indictment.  (Dkt. #193 (Kogan plea transcript)).

While the 2016 case proceeded in the manner just described, Mr. Kogan was investigated separately for a different fraud involving no-fault insurance companies.  Again, the Government has accurately summarized the relevant portions of Mr. Kogan's PSR, and the Court includes that summary here:

> In the No-Fault Insurance Scheme, which took place between approximately March 2014 and June 2016, an acupuncturist named Elizabeth Chidder set up two professional corporations at the request of the defendant.  Kogan actually controlled the businesses and paid Chidder a salary from a portion of the proceeds (keeping the rest himself), but the businesses were registered in Chidder's name only.  Kogan also coached Chidder how to lie about his involvement in the practices during an "Examination Under Oath" in which she was questioned under oath by representatives of an insurer. *See* PSR ¶¶ 56-62.  Kogan had been accused of fraudulent no-fault insurance schemes in the past by several of the major no-fault insurers, and had entered into settlement agreements with two of the largest (Geico and Liberty Mutual) to resolve their claims against him. Pursuant to one of the settlement agreements, he had agreed not to submit any future billing — under his name, or under the name of any entity in which he had direct or indirect ownership or control — without giving advance notice to the insurer. PSR ¶ 65.
>
> A total of $293,851 was paid by Geico and Liberty Mutual for services performed by Chidder's companies. PSR ¶ 66. Had the insurers known the truth — that the

> acupuncture clinics were in fact controlled by Kogan despite being registered in Chidder's name — they need not have paid the claims due to the fraudulent incorporation of the companies. PSR ¶¶ 63.

(Dkt. #256 at 3).

Indictment 17 Cr. 541 (RWS) (the "2017 Indictment") was returned by the grand jury on August 30, 2017 (2017 Dkt. #8), and Mr. Kogan was arraigned on the 2017 Indictment on September 7, 2017 (2017 Dkt. #10). On June 25, 2018, Mr. Kogan pleaded guilty before the Honorable Kevin Nathaniel Fox to Count One of the 2017 Indictment, pursuant to a superseding plea agreement with the Government that was designed to cover both his 2016 and 2017 cases. (*See* 2017 Dkt. #44 (Government letter requesting acceptance of guilty plea, and enclosing plea transcript and preliminary order of forfeiture); PSR ¶ 7 (outlining superseding plea agreement)). The superseding plea agreement contained the parties' stipulations under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), including their stipulation that the applicable Guidelines range for Mr. Kogan's fraudulent conduct was 57 to 71 months' imprisonment. (PSR ¶ 7).

Judge Sweet accepted the plea by order dated June 27, 2018 (2017 Dkt. #46), and consolidated the sentencing proceedings in the 2016 and 2017 cases in an endorsement dated July 2, 2018 (2017 Dkt. #48). In anticipation of Mr. Kogan's sentencing, Judge Sweet issued a pre-sentencing opinion, dated February 8, 2019, in order to allow the parties to understand his preliminary views regarding sentencing. *See generally Sentencing Opinion*, 2019 WL 494013. After outlining the offense conduct, the relevant statutes, and the

proper Guidelines calculation, Judge Sweet announced his intent to sentence Mr. Kogan to concurrent terms of 60 months' imprisonment, in the middle of the applicable Guidelines range. *Id.* at *7-8.

At the sentencing proceeding on February 12, 2019, defense counsel asked the Court to reconsider its contemplated term of imprisonment, noting that Mr. Kogan "has lived, up until the conduct in this case, frankly, the immigrant's American dream." (Dkt. #232 at 4; *see also id.* ("But this wasn't necessarily a crime motivated by greed so much as need; meaning, Mr. Kogan wasn't trying to bilk the system, he was trying to simply get paid for the work that he did.")). After hearing from the parties, Judge Sweet determined to vary downwardly to impose concurrent terms of 50 months' imprisonment, explaining:

> Every sentence of incarceration causes pain and suffering for those members of the family who are not incarcerated but suffer the consequences of losing father, brother, whatever. And if one could somehow maintain the sentence that would be suffered solely by the culprit, that would be one thing, and one would wish you could do that. I'm not insensitive to the needs of the family and the consequences for society because of the deprivations that will be imposed upon the family. I'm well aware of that. But that's not the point. Unfortunately, the point is that crimes were committed; society was harmed by those crimes because the money was used for something that society has said it should not be used for. So the entire society was deprived.
>
> I'm going to impose the sentence as set forth in the sentencing opinion, but I will reduce the term by ten months in each case, and that's a consideration based upon the needs of the family. It's not much and it isn't going to change much, but I do want it known that I'm not insensitive to that problem and that society is not insensitive to it[.]

(*Id.* at 10; *see also* Dkt. #229 (judgment filed in 2016 case); 2017 Dkt. #66 (judgment filed in 2017 case)).

Mr. Kogan began serving his sentence on April 15, 2019. (Dkt. #256 at 4). On June 10, 2020, Mr. Kogan submitted his counseled motion for early release from custody pursuant to the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. #251-254).[2] The Government submitted its opposition on May 22, 2020. (Dkt. #256). Mr. Kogan submitted his counseled reply on June 29, 2020. (Dkt. #257). In response to Court order, the Government and Mr. Kogan submitted supplemental letter briefs on September 4 and 8, 2020, respectively. (Dkt. #261, 262).

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

---

[2]   The Court recognizes, as did the Government (*see* Dkt. #256 at 1 n.1), that counsel for Mr. Kogan on this motion represented Co-Defendant Hasan-Hafez in certain proceedings before Judge Sweet. Given the instant procedural posture, the Court does not believe that a *Curcio* hearing is warranted.

The Court further recognizes that Mr. Kogan's compassionate release motion was filed in the 2016 case that was reassigned to it after Judge Sweet's passing, and not in the 2017 case that was not reassigned to it. This Court's resolution of the motion would be the same were the 2017 case to be transferred to it.

7

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). In making this determination, the court must consider the "the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable." *Id.* § 3582(c)(1)(A). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Congress has delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet this standard, *inter alia*, when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & Application Note 1(A), (D). Following the passage of the First Step Act, courts may independently determine whether such "other reasons" are present in a

given case, without deference to the determination made by the BOP.  *See United States* v. *Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).  In addition, the Sentencing Commission counsels that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).

## DISCUSSION

In its supplemental submission of September 4, 2020, the Government advises that the Warden at FCI Cumberland received Mr. Kogan's compassionate release request, in the form of an email from Mr. Kogan's wife, on June 11, 2020, and denied the request on June 23, 2020.  (Dkt. #261).  Given the Warden's resolution, the Court declines to resolve the parties' dispute regarding whether Mrs. Kogan could validly submit a request on her husband's behalf, and finds the administrative exhaustion requirement to be satisfied.  It thus proceeds to consider whether Mr. Kogan has identified "extraordinary and compelling reasons" warranting his release, and concludes that he has not.

As noted, Mr. Kogan argues that the conditions of his incarceration at the satellite prison camp at FCI Cumberland place him at a higher risk of contracting COVID-19 (or of having a more severe reaction if infected), because of the nature of his confinement at the facility, his existing medical conditions, and the inability of prison staff to handle an outbreak of the virus.  The Court recognizes, as do the parties, that sister courts in this District have granted,

9

and denied, compassionate release motions based on the existence of the COVID-19 pandemic and the risks of its transmission at prisons. *See generally United States* v. *Morrison*, No. 16 Cr. 551-1 (KPF), 2020 WL 2555332, at *2 (S.D.N.Y. May 20, 2020); *see also United States* v. *Kerrigan*, No. 16 Cr. 576 (JFK), 2020 WL 2488269, at *3 (S.D.N.Y. May 14, 2020) (collecting cases). Indeed, counsel for Mr. Kogan has been exceptionally comprehensive in documenting compassionate relief motions that have been granted because of concerns about the COVID-19 virus; the Court recognizes, and notes its appreciation, for this diligence. (*See* Dkt. #254 at 13-19).

This Court continues to align itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (collecting cases); *see also United States* v. *Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) ("Instead, compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant. In practice, courts in this district have considered the age of the prisoner; the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the

term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." (internal citations omitted)).

Mr. Kogan has not demonstrated the existence of extraordinary and compelling circumstances in his case. Mr. Kogan is 45 years old, which places him at a slightly elevated risk of hospitalization or death from COVID-19. *See* Weekly Updates by Select Demographic and Geographic Characteristics, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed September 8, 2020). Mr. Kogan hastens to add, however, that he has various comorbidities that exacerbate his risk, including chronic moderate intermittent asthma, rhinitis, a fatty liver, and paroxysmal extrasystole. (Dkt. #254 at 4, 22; Dkt. #257 at 9). His support for these conditions is a note from a physician who has treated him since 2008. (Dkt. #253-3). The conclusivity of that note, however, is significantly undermined by Mr. Kogan's discussion of his physical conditions during his presentence interview (*see* PSR ¶ 102 (reporting "no prior history of serious illnesses or medical conditions")), and by the lack of substantiation for these conditions in his BOP medical records (*see* Dkt. #256, Sealed Exhibit A). To the extent that Mr. Kogan may have been treated for any or all of these conditions previously, they do not appear to impact his present health.

In any event, the Centers for Disease Control and Prevention has recently revised its analysis of comorbidities, distinguishing conditions that place individuals at higher risk with regard to COVID-19, from conditions that *might* place individuals at higher risk, but for which more study is required.  *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (accessed September 8, 2020).  Even were the Court to ascribe significance to his physician's note, only Mr. Kogan's history of asthma would fall into the latter category, and his other conditions would not fall into either category.

The Court has reviewed with care Mr. Kogan's BOP medical records, which make clear that Mr. Kogan has worked successfully with BOP medical professionals to address health issues, even in recent months.  *Cf.* CENTERS FOR DISEASE CONTROL AND PREVENTION, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (accessed September 8, 2020) ("People of all ages with underlying medical conditions, *particularly if not well controlled*...." (emphasis added)).  There is nothing to suggest that Mr. Kogan has been unable to care for himself or has been neglected by BOP medical personnel.  Instead, Mr. Kogan appears to have received appropriate medical care while incarcerated.  *See, e.g., Brady*, 2020 WL 2512100, at *3-4

(acknowledging serious nature of defendant's medical conditions but denying compassionate release where conditions stable and managed in BOP facility); *United States* v. *Garcia*, No. 18 Cr. 802 (CM), 2020 WL 2468091, at *5-6 (S.D.N.Y. May 13, 2020) (denying compassionate release to defendant with asthma, hypertension, and heart conditions housed in facility with 40 documented cases of virus).

Federal courts, including this Court, have been appropriately concerned about the conditions of confinement at federal facilities. *See, e.g., United States* v. *Thaher*, No. 17 Cr. 302-3 (KPF), 2020 WL 3051334, at *5-6 (S.D.N.Y. June 8, 2020), *reconsideration denied*, No. 17 Cr. 302 (KPF), 2020 WL 5202093 (S.D.N.Y. Sept. 1, 2020); *United States* v. *Park*, No. 16 Cr. 473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020). To that end, this Court has scrutinized the BOP's Pandemic Influenza Plan, *see* https://www.bop.gov/coronavirus/ (last accessed September 8, 2020), as well as the BOP's listing of confirmed cases among inmates and staff at each facility. As of the date of this Order, the BOP has identified <u>no</u> current cases of COVID-19 among staff or inmates at the satellite camp at FCI Cumberland at which Mr. Kogan is housed; one staff member at the camp has recovered from the virus. (Dkt. #261 at 1). On balance, this Court concludes that the danger that Mr. Kogan faces from infection with COVID-19, even accounting for his proffered medical conditions, does not amount to an extraordinary and compelling reason for granting compassionate release. *Cf. United States* v. *Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks

13

that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Separately, the factors set forth in 18 U.S.C. § 3553(a) counsel against granting Mr. Kogan's motion. Those factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C). The Court accepts Mr. Kogan's statements about his remorse for his criminal conduct and his concerns about his family, and it recognizes the work that he and his counsel have expended in crafting a "demonstrated and verifiable entry plan." (Dkt. #254 at 23-24). But as the PSR details, Mr. Kogan participated in two separate health care fraud conspiracies; in the first, Medicare and Medicaid suffered actual losses of $1,297,000, while in the second, Geico and Liberty Mutual suffered actual losses of $293,851. (PSR ¶¶ 45, 66). Mr. Kogan was permitted to resolve both cases in a single plea agreement and a single sentencing, which worked in his favor on both offense level and criminal history calculations under the Guidelines. He then received a significant downward variance from Judge Sweet on account of his family circumstances. This Court concludes that it would undercut the § 3553(a) factors for it to allow Mr. Kogan to serve just 17 months of a 50-month sentence. And while Mr. Kogan's conduct was

14

concededly non-violent, it was serious and took place over a period of years. Mr. Kogan also directed the activities of others in his frauds; the PSR recites that he pressured a cooperating witness into falsifying submissions to Medicare and Medicaid (*see* PSR ¶¶ 28-30), and that he coached a co-defendant to lie at an examination under oath (*id.* at ¶ 56).  Accordingly, even if the Court had found extraordinary and compelling circumstances on the facts presented, which it has not, it would deny Mr. Kogan's application based on its contemporaneous consideration of the § 3553(a) factors.[3]

## CONCLUSION

For the foregoing reasons, Defendant Ilya Kogan's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED.  The Clerk of Court is directed to terminate the motions at docket entries 251, 253, and 256.

SO ORDERED.

Dated:   September 9, 2020
         New York, New York

*[signature: Katherine Polk Failla]*

KATHERINE POLK FAILLA
United States District Judge

---

[3]   To the extent that he has not otherwise done so, Mr. Kogan can pursue relief in the form of a furlough under 18 U.S.C. § 3622 or home confinement as contemplated in the CARES Act, Pub. L. No. 116-136 (2020), and the Attorney General's April 3, 2020 memorandum to the BOP.  The decision to grant any such relief, however, is reserved to the discretion of the BOP.